UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
JEAN HYACINTHE,

      Plaintiff,

  - against –

THE UNITED STATES OF AMERICA,

      Defendant.
----------------------------------------X

FOR ELECTRONIC
PUBLICATION ONLY

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

05-CV-1363 (KAM) (VVP)

MATSUMOTO, United States District Judge:

     Plaintiff Jean Hyacinthe ("Hyacinthe" or "plaintiff")
commenced this action against the United States ("defendant")
pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and
2671, for personal injuries allegedly sustained as a result of
an automobile collision on November 5, 2003. (*See* Doc. No. 46,
Pretrial Order, at 1.) A bench trial was held on October 20 and
22, 2008. (*See generally*, Doc. Nos. 60-61, Transcript of Bench
Trial ("Tr.").)

     After reviewing the submissions of the parties, and
having considered the evidence at trial and assessed the
credibility of the witnesses, the court makes the following
findings of fact and conclusions of law as required by Rule 52
of the Federal Rules of Civil Procedure. For the reasons set
forth below, the court orders that plaintiff take nothing of
defendant, and directs the Clerk of Court to enter judgment in
favor of defendant and close this case.

**FINDINGS OF FACT**

**A. The Collision**

On November 5, 2003, plaintiff, a Starbucks supervisory employee, and United States Postal Service ("USPS") employee Robert McDougall ("McDougall") were involved in an automobile collision. (Tr. at 12, 24, 150.) The collision occurred on the southbound side of Route 110 in Melville, New York, south of Fletcher Avenue. (Tr. at 30, 150.) At the time of the collision, plaintiff was driving a Mazda MPV caravan, which he had borrowed from a friend (Tr. at 11-12), and McDougall was driving a single-axle Mack truck with a 33-foot trailer (Tr. at 149). It was raining "heavily" at the time of the collision, the roads were wet (Tr. at 17, 70) and "the sky was cloudy" (Tr. at 17). Consistent with the weather conditions, traffic was moving slowly. (Tr. at 163.) Mr. McDougall testified that he had been traveling between 20 to 30 miles per hour down Route 110 South. (Tr. at 164-165.) There were businesses on the right side of the road. (Tr. at 19-20, 70-71, 152.)

Immediately before the collision, McDougall observed a vehicle exiting a parking lot of a Krispy Kreme doughnut shop, which was situated on the right side of southbound Route 110. (Tr. at 152.) Mr. McDougall testified that the "vehicle [] looked like it was going to jet out into oncoming traffic,

southbound, without stopping." (Tr. at 153.) McDougall testified that he looked toward the exiting vehicle on his right and he applied the brakes because he "thought there was going to be a problem with this car coming into traffic." (Tr. at 170.) McDougall then looked ahead and observed plaintiff's vehicle at a complete stop approximately 40 feet ahead. (Tr. at 174-175.) As McDougall applied the brakes, his truck skid on the wet roadway and collided with the rear end of plaintiff's stationary vehicle. (Tr. at 87, 175.) According to plaintiff, the impact from the collision caused plaintiff's vehicle to move forward "[p]robably a couple of car lengths . . . ." (Tr. at 22.) According to the police accident report and Mr. McDougall, there was "no traffic light where the accident occurred" and the nearest traffic light was approximately "well over a hundred feet" ahead. (Tr. at 161; *see* Stipulated ("Stip.") Ex. A, Police Accident Report.)

## B. Plaintiff's Injuries

Plaintiff, who was 31 years old on the date of the collision (*see* Police Accident Report), was taken by ambulance from the scene of the collision to North Shore University Hospital at Plainview ("North Shore"). (Tr. at 26; Stip. Ex. I, Emergency Room Records, at Bates No. 123.) There, x-rays were taken of plaintiff's cervical spine, chest, thoracic spine, lumbar spine and pelvis. (*See id.* at Bates Nos. 124, 131-134,

137-141.) The x-rays revealed no fractures, dislocations, or other bone, joint or soft tissue abnormalities. (*See id.*) Similarly, a CT scan of plaintiff's cervical spine revealed no abnormalities. (*Id.* at Bates Nos. 135-136.) Plaintiff was diagnosed with musculoskeletal pain status post motor vehicle collision. (*Id.* at Bates No 124.) Plaintiff testified that he had never previously injured his back or neck. (Tr. at 60.)

The next day, November 6, 2003, plaintiff visited Bay Shore Physical Medicine and Rehabilitation ("Bay Shore") and was treated by Dr. Alan L. Cohen, M.D. (*See* Tr. at 29-30; Stip. Ex. H, Bay Shore Records, at Bates No. 20-27.) There, plaintiff complained of localized and non-radiating neck and low back pain. (*Id.* at Bates No. 20.) X-rays of plaintiff's cervical spine taken on that date revealed loss of cervical lordosis, decreased disc space between C5 and C6, and no fractures. (*Id.* at Bates No. 23.) Similarly, x-rays of plaintiff's lumbar spine revealed loss of lumbar lordosis, decreased disc space between L5 and S1, no fractures and "a right convex scoliosis without rotation most likely due to muscle spasm." (*Id.*) Dr. Cohen diagnosed plaintiff with neck and low back pain, for which he prescribed physical therapy, home exercises and Skelaxin, a muscle relaxant. (*Id.* at Bates No. 21.) Dr. Cohen also issued plaintiff a note which stated, *inter alia*, that plaintiff was unable to work on November 6-8, 2003 and was able to return to

4

work on November 10, 2003, and noted "light duty" on the line for "restrictions/remarks." (*Id.* at Bates No. 24; Tr. at 40.)

Plaintiff attended physical therapy at Bay Shore three times per week from November 7, 2003 through December 8, 2004. (*See* Tr. at 32, 34; Stip. Ex. H, Bay Shore Records, at Bates Nos. 2-6.) During a January 9, 2004 follow-up visit with Dr. Cohen, plaintiff reported that although he continued to experience pain, physical therapy had been very helpful in reducing pain and improving his overall functioning. (*See id.* at Bates No. 18.) With respect to plaintiff's cervical spine, Dr. Cohen reported that plaintiff experienced pain at the end ranges of extension and flexion. (*Id.*) He also observed that plaintiff's lumbar spine was minimally tender. (*Id.*) Plaintiff's condition remained essentially the same throughout the remainder of his treatment with Dr. Cohen. (*See id.* at Bates Nos. 9-16.) Dr. Cohen's final assessment took place on November 8, 2004, during which he found that plaintiff's cervical spine demonstrated "good cervical lordosis[,]" tenderness, "grossly normal" range of motion, intact sensation, full muscle strength, and normal reflexes. (*See id.* at 8.) As to plaintiff's lumbar spine, Dr. Cohen found that it demonstrated a "mild decrease in lumbar lordosis[,]" muscle tenderness at L3 to L5, normal range of motion, discomfort at the end ranges of extension and flexion, full muscle strength,

intact sensation, and normal reflexes. (*Id.; see also id.* at Bates No. 18.)

Plaintiff testified that as a result of the accident, he was unable to engage in certain daily activities for approximately one year. (*See* Tr. at 38-39, 41.) Specifically, plaintiff testified that he could not play football or "pickup" basketball games with his children, and cook or clean his house. (*Id.*) At work, plaintiff had difficulty performing certain physical tasks, such as stocking the refrigerator with milk. (*See* Tr. at 40-42, 85-86.)

Notwithstanding, plaintiff testified that he missed three days from work, was able to take public transportation, and maintained the same supervisory position at work following the collision. (Tr. at 84.) Plaintiff further testified that he was able to perform physical activities such as mopping and stocking milk, and that he delegated tasks when necessary. (*See* Tr. at 85.)

Although there is no evidence that plaintiff received any medical treatment for his neck and low back pain from January 2005 through February 2006, plaintiff testified that "[o]verall, the pain was constant." (*See* Tr. at 54-55.) More than two years after the November 5, 2003 collision, on March 15, 2006, plaintiff presented to the emergency room of St. Catherine of Sienna Medical Center in Smithtown, New York and

complained about pain in his low back and left leg for the past few days. (*See* Tr. at 49-50; Stip. Ex. K, St. Catherine Records, at Bates Nos. 155, 158, 159.) Plaintiff advised the emergency room staff that he had experienced "sciatica since a motor vehicle accident three years ago[.]" (Tr. at 51; *see* Stip. Ex. K at Bates No. 159.)

The next day, on March 16, 2006, plaintiff followed up with his primary care physician, Dr. Cindy Smith, D.O. (*See* Stip. Ex. L, Premier Family Medical Associates, P.C. Records, at Bates No. 188; Tr. at 51.) Plaintiff's chief complaint and reason for the visit was pain in his low back and left leg for the past three days, which became severe at work the day before. (*Id.*)

Dr. Smith referred plaintiff to Optimal Care Physical Therapy, P.C. ("Optimal Care"), which plaintiff visited on March 16, 2006. (*See* Tr. at 51; Stip. Ex. J, Optimal Care Records, at Bates No. 188.) Plaintiff's "Patient Information" form, which plaintiff completed on March 16, 2006, states that plaintiff experienced a stiff lower back and "pain . . . shooting straight down [the] left leg." (*Id.; see* Tr. 79.) Plaintiff also stated that this problem began on March 14, 2006 and that he had not previously had this problem. (Stip. Ex. J, at Bates No. 148.)

On April 29, 2006, plaintiff visited Dr. Edward Firouztale, D.O. for a neurologic consultation ordered by Dr.

Smith.  (*See* Stip. Ex. L, at Bates No. 178-179.)  According to

Dr. Firouztale's report of the April 29, 2006 consultation,

plaintiff advised Dr. Firouztale that "approximately 1.5 months

ago he experienced an acute onset of pain extending from the

left low back in the posterior distribution to the left foot."

(*Id.* at Bates No. 178.)  Plaintiff further advised Dr.

Firouztale that "he has had low back pain in the past, status

post a motor vehicle accident three years ago.  However, lumbar

pain had completely resolved prior to this event."  (*Id.; see

also* Tr. at 75.)  Among other things, Dr. Firouztale ordered an

MRI scan to "rule out [a] herniated disc."  (Stip. Ex. L at

Bates No. 179.)

An MRI scan of plaintiff's lumbar spine was performed

on May 12, 2006.  (*See* Stip. Ex. N, BAB Radiology Records, at

Bates No. 236.)  The MRI scan revealed "[m]ild degenerative

changes . . . at L5-S1 associated with small left parasagittal

disc herniation with no nerve root displacement" and

"[s]traightening of the normal lumbar lordosis."  (*Id.*)

Thereafter, on January 9, 2007, plaintiff treated with

Dr. Hargovind DeWal, M.D., an orthopedic surgeon whom plaintiff

called as an expert witness at trial.  (*See* Tr. at 55-56, 207-

208, 211.)  Dr. DeWal testified that during plaintiff's initial

evaluation, plaintiff "complained mostly of lower back pain" as

well as "a complaint of neck pain radiating into his

[plaintiff's] shoulder . . . ." (Tr. at 221.) On January 7, 2007, Dr. DeWal conducted a physical examination of plaintiff that measured plaintiff's range of motion in both plaintiff's cervical and lumbar spine and found it to be limited by pain. (Tr. at 211-216.) Dr. DeWal testified that plaintiff reported he did not experience pain in his neck or back before the November 2003 collision. (Tr. at 231; *see also* Stip. Ex. P, Long Island Spine Specialists, P.C. Records, at Bates Nos. 252-253.)

Dr. DeWal testified that, with the exception of the May 12, 2006 MRI scan of plaintiff's lumbar spine, he did not review any x-rays or the CT scan results conducted before January 9, 2007, nor review any medical records or diagnostic test results related to plaintiff's November 2003 collision. (Tr. at 220, 279, 283.) As to plaintiff's May 12, 2006 MRI scan, Dr. DeWal found that plaintiff's lumbar spine "had a degenerated and herniated disk off to the left side at L5-S1." (Tr. at 217.) The MRI report dated May 15, 2006, found "mild degenerative changes" at L5-S1 "associated with a small left parasagittal disc herniation without evidence of nerve root displacement" and "no evidence of significant disc protrusion or focal disc herniation." (Stip Ex. N, at Bates No. 236.) Dr. DeWal ordered an MRI scan of plaintiff's cervical spine, conducted on January 12, 2007, which states an impression:

9

"small posterior disc abnormalities at C4-C5 and C5-6 without MRI evidence of central canal stenosis or nerve root impingement." (*Id.* at Bates No. 238.) Dr. Dewal also ordered an MRI scan of plaintiff's lumbar spine, which was conducted on February 7, 2007. (*See* Tr. 222; Stip. Ex. N at Bates No. 239.) Dr. DeWal testified that the February 2007 MRI scan revealed that disk L5-S1 was degenerated and "herniated into the spinal canal." (Tr. at 223.) The report of the February 2007 MRI states an impression: "L5-S1 broad-based central and left sided disc herniation just touches the central aspect of the thecal sac and the left S1 nerve root." (*Id.* at Bates No. 239.)

Dr. DeWal also ordered a discogram test, conducted on February 8, 2007, to confirm his finding of a disk herniation as the source of plaintiff's pain. (*See* Tr. at 233-234; Stip. Ex. P, at Bates Nos. 258-260, 275-276.) According to Dr. Dewal, the discogram confirmed plaintiff's pain in the L5-S1 disk. (Tr. at 233-234.) The discogram report, however, does not reference the disk herniation as the source of plaintiff's pain. (*See* Stip. Ex. P, at Bates Nos. 275-276.) Based on the results of the MRI scans and discogram test, plaintiff's subjective complaints of "persistent pain" and the "failure of non-operative treatment," Dr. DeWal recommended lumbar spinal fusion surgery. (*See* Tr. at 236, 238, 248.)

Dr. DeWal testified that because plaintiff did not undergo lumbar spinal fusion surgery, he was unable to determine within a reasonable degree of medical certainty whether the restrictions he observed in plaintiff's range of motion was permanent in nature. (Tr. at 250-251.) He testified, however, that the restrictions he observed pose a "significant limitation" of the use of plaintiff's lumbar spine. (Tr. at 251.) Dr. DeWal defined "significant pain" as pain that "interferes with your ability to carry out activities of daily living or activities that you normally would do." (Tr. at 251.)

Dr. DeWal opined, to a reasonable degree of medical certainty, that the disc herniation observed on plaintiff's May 12, 2006 and February 7, 2007 MRI scans was caused by the exacerbation of plaintiff's degenerative disc disease resulting from the November 2003 collision. (Tr. at 231-232, 265, 290.) In so opining, Dr. DeWal relied only on the patient history provided by plaintiff (Tr. at 284), and not on any objective medical findings that were made on the day of, the day after, or during the year following the collision that gave rise to this action. (Tr. at 294-295.) Dr. DeWal testified that "[t]he fact that he [plaintiff] didn't have pain beforehand [before the collision] . . . that's key here." (Tr. at 231, 250.) Dr. DeWal's failure to consult any objective medical findings, x-rays or other examinations from the first 2.5 years after the

collision (*see* Tr. at 220, 279, 283) casts serious doubt on his conclusions and thus, the court does not credit his opinion that plaintiff's herniated disk was caused by the November 2003 collision.

Defendant's expert radiologist, Dr. Lewis Rothman, M.D., testified that, following a review of plaintiff's medical records, including the x-rays and CT scan taken on November 5-6, 2003 and subsequent MRI scans, he saw no evidence of a permanent injury. (Tr. at 132-133.) Moreover, Dr. Rothman further testified that although the x-rays and CT scan from November 5-6, 2003 revealed no evidence of disc bulges or disc herniations (Tr. 102, 117-118, 136), there was evidence of degenerative disk disease at C5-C6, which showed "a small bone spur projecting posteriorly at that level" (Tr. at 109). Dr. Rothman testified that for the bone spur to have been visible to the degree he observed on the November 5, 2003 x-rays, "the degenerative change would have had to have been present for many, many months, probably years." (Tr. at 111-112.) Further, based on a review of plaintiff's November 5, 2003 lumbar spine x-ray, Dr. Rothman testified that the lumbar spine was normal. (Tr. at 112-113.) Indeed, Dr. Rothman found no evidence of trauma in any of the x-rays or the CT scan of November 5-6, 2003. (*See* Tr. at 112-118.)

Defendant's additional expert, Dr. Jonathan Garay, D.O., a specialist in physical medicine and rehabilitation, testified that the x-rays taken on November 6, 2003 showed the presence of disc space narrowing in the cervical and lumbar spine, "which is a sign of degenerative disk disease." (Tr. at 320.) To reach his conclusion, Dr. Garay conducted two physical examinations of plaintiff and reviewed, among other things, plaintiff's November 5, 2003 emergency room records from North Shore, records from Bay Shore, diagnostic reports of x-rays and the CT scan taken on November 5-6, 2003, and reports of the MRI scans. (Tr. at 315-317, 319-320, 322-323.) Dr. Garay opined, with a reasonable degree of medical certainty, that plaintiff sustained "strains and sprains of the cervical and lumbar spine" as a result of the November 2003 collision. (Tr. at 328-329.) He noted that based on the medical records, plaintiff's physical condition "greatly improved" as a result of physical therapy undertaken in the first two months following the November 2003 collision, which was confirmed by plaintiff's statement in 2006 that "his pain and completely resolved[.]" (*See* Tr. at 334-335; *see* Stip. Ex. L, at Bates No. 178.) Thus, Dr. Garay opined that it is "highly unlikely" that the November 2003 collision "caused his [plaintiff's] herniated disk." (Tr. at 339-340.) Dr. Garay explained that

> [t]he herniation could have been there before the
> accident.  It could have occurred after the
> accident at some time.  It may have occurred
> three days before he [plaintiff] had the sudden
> onset of radiating pain down his left leg.  There
> is absolutely no way of knowing unless you would
> have an MRI before and an MRI right after [the
> collision], absolutely except by gauging his
> symptoms.

(Tr. at 362.)

## CONCLUSIONS OF LAW

The court makes the following conclusions of law.  The court finds defendant liable under New York State negligence law for breaching a duty of care owed to plaintiff. Notwithstanding, the court finds that plaintiff has failed to prove by a preponderance of the evidence that the November 2003 collision caused him to sustain a "serious injury" as defined by New York Insurance Law.

### A. Governing Law

Plaintiff brings this claim pursuant to the FTCA, 28 U.S.C. §§ 1346 and 2671.  (*See* Pretrial Order at 1.)  Under the FTCA, a plaintiff may recover "for . . . personal injury . . . caused by the negligent . . . act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

28 U.S.C. § 1346(b)(1); *see Molzof v. United States,* 502 U.S.
301, 305 (1992) (observing that "the extent of the United
States' liability under the FTCA is generally determined by
reference to state law.") Because the motor vehicle collision
underlying this action occurred in New York (*see* Pretrial Order
at 2), New York tort law applies. *See Eerie R.R. Co. v.
Tompkins,* 304 U.S. 64 (1938); *Rand v. Volvo Finance North
America,* No. 04-CV-349, 2007 WL 1351751, at *1 (E.D.N.Y. May 8,
2007).

"Under New York law, the elements of a negligence
claim are: (i) a duty owed to the plaintiff by the defendant;
(ii) breach of that duty; and (iii) injury substantially caused
by that breach." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280
F.3d 209, 215 (2d Cir. 2002); *see Solomon v. City of New York,*
66 N.Y.2d 1026, 1027 (1985) (citation omitted). In New York,
"negligence is defined as conduct which falls below that of a
reasonably prudent person under similar circumstances judged at
the time of the conduct at issue." *Dockery v. United States*,
No. 07-CV-144, 2009 U.S. Dist. LEXIS 94389, at *11 (N.D.N.Y.
Oct. 8, 2009) (internal quotation marks and citation omitted).

## B. Liability

Under New York law, "[a] rear-end collision with a
stopped or stopping vehicle creates a prima facie case of
liability" on the part of the operator of the following vehicle.

15

*Filippazzo v. Santiago*, 277 A.D.2d 419 (2d Dep't 2000) (citation omitted); *see Luizzi v. Sanchez*, No. 02-CV-5388, 2009 U.S. Dist. LEXIS 7076, at *12-13 (E.D.N.Y. Feb. 2, 2009) (collecting cases). Generally, the owner of a vehicle that is operated negligently is liable for the negligence of the operator. *See* N.Y. Vehicle and Traffic Law ("NYVTL") § 388(1) ("Every owner of a vehicle . . . shall be liable and responsible for . . . injuries to person . . . resulting from negligence in the use or operation of such vehicle . . . by any person using or operating the same with the permission, express or implied, of such owner.")

Here, it is undisputed that the truck operated by McDougall approached and struck plaintiff's vehicle from the rear. (Pretrial Order at 3-4; Tr. at 21-22, 155.) It is also undisputed that McDougall failed to stop the truck before it collided with plaintiff's vehicle, which McDougall observed at a "complete stop" approximately 40 feet ahead. (Tr. at 153, 174-175.) Moreover, at the time of the collision, McDougall operated the truck as an employee of the USPS, which is an instrumentality of defendant United States. (Pretrial Order at 3-4.) Accordingly, plaintiff has established a prima facie case of liability against the United States.

Where, as here, the plaintiff has established a prima facie case of negligence, the defendant must produce a "non-

16

negligent" explanation for the rear-end collision sufficient to overcome the inference of negligence. *See Luizzi*, 2009 U.S. Dist. LEXIS 7076, at *13 (citations omitted); *Leal v. Wolff*, 224 A.D.2d 392, 393 (2d Dep't 1996). "Courts have held non-negligent explanations to include unavoidable skidding on wet or icy pavement, mechanical failure, or the sudden stop of the vehicle ahead." *Luizzi*, 2009 U.S. Dist. LEXIS 7076, at *13-14 (citations omitted); *Filippazzo*, 277 A.D.2d at 419-420.

Here, defendant contends that plaintiff's prima facie showing of negligence is rebutted by evidence that plaintiff "made a sudden stop in pouring rain while traffic was still moving . . . ." (Doc. No. 56, Defendant's Proposed Findings of Fact and Conclusions of Law, ("Def. Mem.") at 20.) Defendant also asserts that "the evidence . . . supports the conclusion that the accident did not occur in the vicinity of a traffic light, and that the most likely explanation for Plaintiff having stopped his car was that another vehicle had exited a nearby Krispy Kreme donut shop and had appeared to be heading straight into traffic . . . ." (*Id.*)

As to defendant's explanation that the roadway was wet from heavy rain, New York courts have held that drivers are obligated to take into account weather and road conditions when maintaining a safe distance between vehicles. *See Mitchell v. Gonzalez*, 269 A.D.2d 250, 251 (1st Dep't 2000) ("Nor is a wet

17

roadway a sufficient defense to rebut the presumption of negligence"); *Young v. New York*, 113 A.D.2d 833, 834 (2d Dep't 1985); *see also Luizzi*, 2009 U.S. Dist. LEXIS 7076, at 14 (citations omitted); *DeJesus v. Raphael*, No. 00-CV-5137, 2002 U.S. Dist. LEXIS 25009, at *7 (S.D.N.Y. Dec. 31, 2002) ("Even assuming, however, that the skid was caused by the wet roadway, it is not sufficient to rebut the presumption of negligence") (citations omitted); *Cf. Carotenuto v. Harran Transp. Co., Inc.*, 226 A.D.2d 334, 334, (2d Dep't 1996) (where evidence adduced at trial established "that the defendant bus driver lost control of the bus on an unanticipated patch of snow or ice," "the jury's determination that the defendants were not negligent is supported by a fair interpretation of the evidence") (citation omitted).

Moreover, as to defendant's explanation that the collision was caused by the plaintiff's "sudden stop," New York law obligates the following driver to maintain a safe distance between cars. *See* NYVTL § 1129(a) ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway"); *Gubala v. Gee*, 302 A.D.2d 911, 912 (4th Dep't 2003) (drivers have a duty to be aware of traffic conditions, including vehicle stoppages"). Thus, where the defendant

acknowledges that there was "stop and go" traffic, "he cannot claim that the plaintiff's stop was unanticipated." *See Harrington v. Kern,* 52 A.D.3d 473 (2d Dep't 2008) (citation omitted); *Leal*, 224 A.D.2d at 393-394 (evidence that plaintiff's car stopped short in heavy traffic was insufficient to raise a triable issue of fact, and concluding that plaintiff should have been awarded summary judgment); *Cf. Goldstein v. United States*, 9 F. Supp. 2d 175, 187 (E.D.N.Y. 1998) (observing that defendant drivers may avoid liability for a rear-end collision under the "emergency doctrine" when "confronted with completely unexpected circumstances, such as a vehicle entering the roadway traveling in the opposite direction," but finding the doctrine inapplicable where the drivers created and contributed to the emergency); *Hardy v. Sicuranza*, 133 A.D.2d 138, 139 (2d Dep't 1987) (emergency doctrine inapplicable where defendant skidded on wet pavement before collision); *Kowchefski v. Urbanowicz*, 102 A.D.2d 863 (2d Dep't 1984) (sudden stop of vehicle in front of defendant did not warrant defense of emergency doctrine in rear-end collision case).

Here, McDougall's credible testimony establishes that he followed plaintiff in slow-moving traffic, during heavy rain conditions, on a wet road.  (Tr. at 152-153, 163.)  McDougall also testified that, just before his truck collided with the rear of plaintiff's vehicle, he looked away from the road to

observe a car that appeared about "like it was going to jet out into oncoming traffic . . . without stopping."  (Tr. at 153.) McDougall's credible testimony also establishes that, after observing this potential traffic problem, he "turned to look forward" at the roadway and saw plaintiff's vehicle at a complete stop approximately 40 feet ahead.  (Tr. at 153, 171, 174-175.)  McDougall's testimony also establishes that as he applied the brakes, his truck skid on the wet roadway and collided with the rear end of plaintiff's stationary vehicle, and that there was no traffic light where the accident occurred. (Tr. at 151, 167, 175; Stip. Ex. A, Police Accident Report.)

By his own testimony, McDougall was aware of the slow traffic conditions, the potential for sudden stops caused by vehicles entering the roadway from adjacent business driveways, and the wet pavement.  (*See* Tr. at 167, 171, 175.)  McDougall's testimony also establishes that he looked away from the roadway despite these conditions and, by the time he looked back, he was unable to stop his truck on the wet pavement before colliding with the rear of plaintiff's stopped vehicle.  (Tr. at 171.)  In this respect, McDougall failed to maintain awareness of the actions of the vehicle in front of him.  *See Johnson v. Phillips*, 261 A.D.2d 269, 271 (1st Dep't 1999) (observing that NYVTL § 1129(a) imposes a duty "a duty to be aware of traffic conditions, including vehicle stoppages").

Even crediting, as the court does, McDougall's testimony regarding the events, the court finds, by a preponderance of the evidence, that McDougall breached his duty of care to plaintiff by colliding with plaintiff's stationary vehicle. Accordingly, the court finds defendant liable for the November 2003 collision.

**C. Serious Injury Requirement
   under New York Insurance Law**

Pursuant to New York Insurance Law's so-called "No Fault" provision, "in any action . . . for personal injuries arising out of negligence in the use or operation of a motor vehicle[,]" the injured party may recover in tort for any "basic economic loss" that exceeds $50,000. N.Y. Ins. Law ("NYIL") § 5104(a). Basic economic loss includes medical expenses, lost wages and other reasonable and necessary expenses. *See id.* New York's No-Fault Law also allows plaintiffs to recover for any non-economic loss, *i.e.*, pain and suffering, but only if the plaintiff sustained a "serious injury." *Id.* "Serious injury" is defined as

> a personal injury which results in death;
> dismemberment; significant disfigurement; a
> fracture; loss of a fetus; permanent loss of
> use of a body organ, member, function or
> system; permanent consequential limitation
> of use of a body organ or member;
> significant limitation of use of a body
> function or system; or a medically
> determined injury or impairment of a non-
> permanent nature which prevents the injured

> person from performing substantially all of
> the material acts which constitute such
> person's usual and customary daily
> activities for not less than ninety days
> during the one hundred eighty days
> immediately following the occurrence of the
> injury or impairment.

*Id.* § 5102(d). "The burden of proving a serious injury rests upon the party seeking additional recovery." *Mesimeris v. United States,* No. 03-CV-0925, 2006 U.S. Dist. LEXIS 3466, at *21 (E.D.N.Y. Jan. 17, 2006).

Here, as set forth in the parties' Pretrial Order, plaintiff seeks $1,000,000 in damages,

> calculated using a simple formula which
> incorporates the pattern jury charge including
> the request for "fair and just compensation" for
> past and future pain and suffering as well as the
> "loss of enjoyment of life" in the past and
> future, that the plaintiff has been forced to
> endure as a result of the defendants [sic]
> actions in this matter.

(Pretrial Order at 2-3.) Plaintiff provides no other specific formulation or evidence of his damages for "pain and suffering."

Plaintiff contends that he sustained a serious injury under "at least one of several categories" of NYIL § 5102(d). (*See* Doc. No. 59, Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl. Mem.") at 12.) Specifically, plaintiff contends that he has established a (1) permanent consequential limitation of use of a body organ or member; (2) significant

limitation of use of a body function or system; and (3)
limitation which prevented plaintiff from performing
substantially all his usual and customary daily activities for
not less than ninety days during the one hundred eighty days
immediately following the collision. (*See id.*) Although
plaintiff discusses only the third category in his post-trial
submission (*see* Pl. Mem. at 12-13), the court will address each
basis in turn.

### 1. Permanent Consequential Limitation

To establish a permanent consequential limitation of
the use of a body organ or member, plaintiff must demonstrate,
through competent medical evidence, that his injury was both
permanent and consequential. *See Tsveitel v. Geoghegan*, No. 05-
CV-5721, 2009 U.S. Dist. LEXIS 62219, at *13 (E.D.N.Y. Jul. 21,
2009) (citing *Kordana v. Pomellito*, 121 A.D.2d 783, 784 (3rd
Dep't 1986)). "In the context of the N.Y. Insurance Law, the
term 'consequential' means 'important' or 'significant.'"
*Tsveitel*, 2009 U.S. Dist. LEXIS 62219, at *13 (quoting *Kordana*,
121 A.D.2d at 784). Thus, a plaintiff must demonstrate
"'something more than . . . a minor, mild or slight limitation
of use.'" *Ventra v. United States*, 121 F. Supp. 2d 326, 333
(S.D.N.Y. 2000) (quoting *Licari v. Elliott*, 57 N.Y.2d 230, 236
(1982)).

"To substantiate a claim under the permanent consequential limitation category, the medical evidence submitted by plaintiff must contain objective, quantitative evidence with respect to diminished range of motion or a qualitative assessment comparing plaintiff's present limitations to the normal function, purpose and use of the affected body organ, member, function or system." *Wolff v. Schweitzer*, 56 A.D.3d 859, 861 (3d Dep't 2008) (citation and internal quotation marks omitted); *see Toure v. Avis Rent A Car Sys.*, Inc., 98 N.Y.2d at 353 (2002). "'[A] plaintiff's subjective claim of pain and limitation of motion must be sustained by verified objective medical findings.'" *Tsveitel*, 2009 U.S. Dist. LEXIS 62219, at *14 (quoting *Grossman v. Wright*, 268 A.D.2d 79, 84 (2d Dep't 2000)).

There is no competent medical evidence that plaintiff's injuries are permanent. To the extent that Dr. DeWal concluded that plaintiff experienced restricted range of motion in his cervical and lumbar spine as a result of the collision, Dr. DeWal testified that he was unable to determine whether such restrictions were permanent in nature. (*See* Tr. at 250-251.) This conclusion was supported by defendant's expert radiologist, Dr. Rothman, who testified that, following a review of plaintiff's medical records, including the x-rays and CT scan taken on November 5-6, 2003 and subsequent MRI scans, he saw no

evidence of a permanent injury. (Tr. at 132-133, 142.)
Consequently, the court finds that the motor vehicle collision
giving rise to this action did not cause plaintiff to suffer a
"serious injury" under the "permanent consequential limitation"
category of NYIL § 5102(d).

### 2. Significant Limitation

Plaintiff's second claim of "serious injury" arises
under the NYIL § 5102(d) category of "significant limitation of
use of a body function or system." (*See* Pl. Mem. at 12-13.)
"[T]he word 'significant' as used in [§ 5102(d)] . . . should be
construed to mean something more than a minor limitation of use
. . . . A minor, mild or slight limitation of use should be
classified as insignificant within the meaning of the statute."
*Licari*, 57 N.Y.2d at 236. "While a 'significant limitation'
does not have to be permanent to qualify as such, its
significance is measured in both 'degree and duration.'" *Jones
v. United States*, 408 F. Supp. 2d 107, 120 (E.D.N.Y. 2006)
(quoting *Gualtieri v. Farina*, 283 F. Supp. 2d 917, 925 (S.D.N.Y.
2003)). Like a permanent consequential limitation, objective
medical findings are crucial for the court's proper
determination of whether plaintiff's alleged injury imposes a
"significant limitation." *See Jones*, 408 F. Supp. 2d at 119
(citation omitted).

The medical evidence does not support a finding that plaintiff suffered any significant limitation as a result of the November 2003 collision. Hospital records from the date of the collision indicate that plaintiff suffered from "musculoskeletal pain[.]" (Stip. Ex. I, at Bates No. 124.) Further, x-rays and a CT scan taken on November 5-6, 2003 revealed no abnormalities with plaintiff's cervical, thoracic or lumbar spine. (*See* Stip. Ex. I, at Bates Nos. 124, 131-134, 136-137.) The only findings on the films are mild degenerative changes in the spine which, Dr. Rothman credibly testified, were not caused by the November 2003 collision. (Tr. at 109-112, 114, 119-121.) Medical records for most the one-year period following the collision indicate that plaintiff experienced some muscle tenderness and varying levels of neck and low back pain. (*See generally*, Stip. Ex. H, at Bates Nos. 8-22.) For this, plaintiff's treatment was limited to physical therapy, muscle relaxants and analgesics. (*See generally,* Ex. H; Tr. 66-67.) Within one year of the collision, the range of motion in plaintiff's cervical and lumbar spine was found to be within normal limits. (*See* Ex. H, at Bates No. 8.) In April 2006, plaintiff reported that the post-accident lumbar pain had "completely resolved," in the period preceding his March 2006 onset of acute pain. (Stip. Ex. L, at Bates No. 178; Tr. at 75.)

Although it is undisputed that plaintiff had preexisting degenerative disk disease in his cervical and lumbar spine and subsequently developed a disc herniation at L5-S1 (*see* Tr. at 111-112, 223-224, 265, 320-321), plaintiff has not established by a preponderance of the evidence that the disk herniation was caused by the November 2003 collision. The undisputed testimony of Dr. Rothman establishes that the disk degeneration was preexisting and progressive. (*See* Tr. at 111-112, 120.) Plaintiff's expert physician, Dr. Hargovind DeWal, opined that plaintiff's degenerative disk disease was exacerbated by the November 2003 collision and caused a disk herniation in plaintiff's lumbar spine. (*See* Tr. at 231-232, 265, 290.) When asked to describe his reasoning in support of this conclusion, Dr. DeWal responded that "I feel it's causally related based on the history . . . . The fact that he [plaintiff] didn't have pain beforehand [before the collision], I think that's key here." (Tr. at 231.) That is, Dr. Dewal's sole basis for opining that plaintiff's disk herniation was causally related to the November 2003 collision was the subjective patient history regarding pain provided by plaintiff. (*See* Tr. at 284.) As previously discussed, Dr. Dewal's failure to rely on any objective medical findings, x-rays or other examinations from the first 2.5 years after the collision (*see* Tr. at 220, 279, 283) casts doubt on his conclusions.

Further, the only objective medical evidence of a herniated disc post-dates a March 2006 incident in which plaintiff suffered sudden pain in his lower back and was required to seek emergency medical care. (*See* Tr. at 49-50; Stip. Ex. K, St. Catherine Records, at Bates Nos. 155, 159.) The evidence establishes that it is more likely than not that plaintiff's disc herniated in or around March 2006, rather than as a result of the November 2003 collision. This conclusion is supported by Dr. Garay's testimony, based on review of plaintiff's medical records since the time of the collision. Dr. Garay noted that plaintiff never complained of radiating pain before the March 2006 incident, and that such radiating pain is closely associated with a herniated disc. (*See* Tr. at 329, 333-335.) Because it is more likely that plaintiff's disc became herniated at the time of his sudden onset of pain in or around March 2006 than as a result of the collision, the court finds that plaintiff has failed to prove by a preponderance of the evidence that he suffered a "significant limitation" caused by the November 2003 collision.

### 3. Prevention of Performing Usual and Customary Activities

Plaintiff's remaining claim of serious injury falls under the so-called "90/180 day rule" of NYIL § 5102(d), which requires plaintiff to demonstrate that he was restricted in

performing "substantially all of the material acts" that
constitute his "usual and customary daily activities" for 90 out
of the 180 days following an injury.  *See* NYIL § 5102(d).  The
New York Court of Appeals has held that

> the words 'substantially all' should be construed
> to mean that the person has been curtailed from
> performing his usual activities to a great extent
> rather than some slight curtailment.  As to the
> statutory 90/180-day period of disability
> requirement . . . . the Legislature has made it
> abundantly clear that disability falling within
> this threshold period must be proved along with
> the other statutory requirements in order to
> establish a prima facie case of serious injury.

*Licari*, 57 N.Y.2d at 236; *see Jones*, 408 F. Supp. 2d at 125
(quoting *Licari* with approval).

As with the other above-referenced "serious injury"
categories under NYIL § 5102(d), plaintiff must establish that
any "restrictions were medically indicated," and any medical
findings that support the 90/180 impairment must be "based on
objective medical findings."  *See Below v. Randall*, 240 A.D.2d
939, 940 (3d Dep't 1997); *see also Rambarrat v. United States*,
No. 04-CV-6115, 2006 U.S. Dist. LEXIS 13236, at *19 (S.D.N.Y.
Mar. 14, 2006) ("Regardless of how Plaintiff seeks to have his
injury categorized as under § 5102(d), the Plaintiff must
establish sufficient evidence of objective medical findings to
demonstrate the existence of an injury by a preponderance of the
evidence.") (citing *Toure*, 98 N.Y.2d at 350).

Here, plaintiff has failed to establish, through objective medical evidence, that he was restricted in performing substantially all of his usual and customary activities for at least 90 days.  The reports of his own physician, Dr. Cohen, consistently show that the plaintiff's range of motion in his cervical and lumbar spine was either normal, or only slightly impaired.  Although Dr. Cohen issued plaintiff a note, *inter alia*, which stated that plaintiff was unable to work for three days following the collision, on November 6-8, 2003, and placed plaintiff on "light duty" upon his return to work (Stip. Ex. H, at Bates No. 24; *see* Tr. at 40), there is no indication that the "light duty" restriction lasted over 90 days, nor what "light duty" entailed.  Further, plaintiff's expert, Dr. DeWal, provided no testimony at trial as to any objectively-determinable medical condition that required plaintiff to restrict "substantially all" of his normal daily activities at work or at home following the collision.

By plaintiff's own account, his daily activities were not restricted in the manner contemplated by NYIL § 5102(d).  Plaintiff testified that three days after the collision, he resumed work in his supervisory position that permitted delegation of physically-demanding duties to subordinates, and that he was subsequently promoted to a position with even less physical demands.  (*See* Tr. at 42-43, 85.)  Plaintiff also

testified that he was able to perform physical activities such as mopping and stocking milk when no subordinate employees were available. (*See* Tr. at 85.)

To the extent plaintiff testified that he was restricted from playing sports with his children, there is no evidence that plaintiff engaged in such recreational activities with sufficient regularity to constitute "usual and customary" daily activities. Instead, plaintiff has presented only generalized statements that he "sometimes" played sports with his children, such as "pickup" games of basketball. (*See* Tr. at 35-36.) *Cf. Panchmia v. Tauber*, 775 N.Y.S.2d 490, 494-95 (N.Y. City Civ. Ct. Queens County 2004) (holding that an injured person's lost exercise and recreational activities are "potentially compensable" where the plaintiff established that he participated in "active exercise with great regularity" and not "some simple 'pickup' game of basketball"); *see also Rookwood v. Valdez*, No. 99-CV-10285, 2001 U.S. Dist. LEXIS 9460, *14 n.6 (S.D.N.Y. July 11, 2001) ("inability to fully participate in recreational activities does not qualify as a serious injury") (citation omitted); *Cooper v. Dunn*, No. 99-CV-6903, 2001 U.S. Dist. LEXIS 881, at *36 (E.D.N.Y. Jan. 2, 2001) (noting that "substantially all" means being unable to perform usual daily activities to a great extent, and that plaintiff's inability to play a pick-up game of basketball or do push-ups

are "simply not losses for which recovery is permitted") (citation omitted).

Accordingly, plaintiff has failed to establish that the November 2003 collision caused any injury that resulted in a 90-out-of-180-day curtailment of substantially all his usual and customary daily activities. Plaintiff has therefore failed to establish by a preponderance of the evidence that he sustained a "serious injury" within the meaning of NYIL § 5102(d).

## CONCLUSION

For the foregoing reasons, the court finds, based on a preponderance of the evidence, that plaintiff has established defendant's negligence as the cause of the November 5, 2003 motor vehicle collision. Notwithstanding, the court also finds, based on a preponderance of the evidence, that plaintiff has failed to establish a "serious injury" under New York Insurance Law § 5102(d). Accordingly, it is hereby ordered that plaintiff take nothing of the defendant and that the Clerk of the Court enter judgment in favor of defendant and close this case.

SO ORDERED.

Dated: Brooklyn, New York
       November 19, 2009

                                    /s/
                        _____
                        KIYO A. MATSUMOTO
                        United States District Judge
                        Eastern District of New York